UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-63162-COHN/STRAUSS

**W.P. PRODUCTIONS, INC.,**

 Plaintiff,

v.

**TRAMONTINA U.S.A., INC.,** *et al.*,

 Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

THIS MATTER came before the Court upon Sam's West, Inc.'s Motion for Summary Judgment ("Sam's MSJ") [DE 188], filed by Judgment Creditor, Sam's West, Inc. ("Sam's"), and the Motion for Summary Judgment ("Silverman's MSJ") [DE 190], filed by Sydney Silverman ("Silverman"). Both motions have been filed in connection with pending proceedings supplementary that Sam's previously commenced against Silverman pursuant to section 56.29 of the Florida Statutes. *See* [DE 138]. I have reviewed both motions, the briefing and statements related thereto [DE 189, 191, 194-97, 200-01, 204], all other summary judgment materials, and the record in this case. For the reasons discussed herein, I respectfully **RECOMMEND** that Sam's MSJ [DE 188] be **GRANTED** and that Silverman's MSJ [DE 190] be **DENIED**.

## BACKGROUND

Sam's holds two judgments [DE 105, 120] against Judgment Debtor, W.P. Productions, Inc. ("WPP"), the first for $2,672,977.86, and the second (a fee judgment) for $58,573.50. WPP

---

[1] All post-judgment matters have been referred to me – for appropriate disposition, evidentiary hearing, and/or report and recommendation – pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida [DE 128].

was founded in 1994. Statement of Undisputed Facts ("Silverman's Stmt.") [DE 191] ¶ 25 (undisputed). Silverman, the defendant in these proceedings supplementary, is the founder, president, and sole shareholder of WPP, as well as the person who made the decisions on what bills to pay for WPP. *Id.* ¶¶ 1, 24 (undisputed); Statement of Undisputed Material Facts in Support of Sam's West, Inc.'s Motion for Summary Judgment ("Sam's Stmt.") [DE 189] ¶ 17 (undisputed). In August 2018, Silverman shut down WPP's business operations and moved funds back and forth among himself, WPP, and affiliated companies. Sam's Stmt. ¶ 14 (undisputed). In November 2019, Silverman testified that WPP did not have the money to pay the amount it owed to Sam's at that time (the amount subsequently included in Sam's first judgment against WPP). *Id.* ¶ 18 (undisputed). In September 2020, WPP was administratively dissolved by the Florida Secretary of State. *Id.* ¶ 20 (undisputed).

The first judgment against WPP in this case [DE 105] stems from 2015 and 2016 transactions between Sam's and WPP. *See id.* ¶¶ 6-9 (undisputed); *see also* Order Granting Motions for Summary Judgment [DE 104] ("2020 MSJ Order") at 7-12. On April 21, 2016, after WPP failed to pay Sam's approximately $1.75 million related to the 2015 transactions, WPP signed a Claim Installment Payment Agreement [DE 189-6],[2] agreeing to pay the outstanding debt pursuant to a payment schedule (between April and December 2016). Sam's Stmt. ¶ 7 (undisputed); [DE 189-6]. After making some payments during or before September 2016, WPP stopped making payments, leaving a balance of more than $1 million. Sam's Stmt. ¶ 9 (undisputed). In connection with the 2016 transaction between WPP and Sam's, WPP owed Sam's an additional $1.2 million. *Id.* ¶ 8 (undisputed). On October 9, 2017, Sam's made demand on WPP for payment of certain amounts due to Sam's. *Id.* ¶ 12 (undisputed). Ultimately, by the time

---

[2] Silverman signed the agreement on behalf of WPP (as WPP's president). *See* [DE 189-6].

2

final judgment was entered in the underlying case on Sam's claims against WPP concerning the 2015 and 2016 transactions, WPP owed Sam's $2,672,977.86 (the amount of the first judgment against WPP). *See* 2020 MSJ Order at 7-12; Final Judgment [DE 105].

Unable to satisfy the judgments against WPP, Sam's commenced the instant proceedings supplementary pursuant to section 56.29 of the Florida Statutes. *See* [DE 123, 138]. In its Amended Complaint [DE 148] in the current proceedings supplementary, Sam's includes two counts labeled as follows: (1) Declaratory Judgment (Collateral Estoppel – Alter Ego); and (2) Declaratory Judgment (Alter Ego). In a prior Report and Recommendation ("2021 Report") [DE 170] adopted by the District Court [DE 172], I provided the following synopsis of the Amended Complaint [DE 148] and the relief sought therein:

> [Sam's] seeks to have the Court pierce the corporate veil against Silverman, the sole shareholder of WPP, and thus, add Silverman as a judgment debtor to the two judgments against Judgment Debtor. Although the Amended Complaint contains two declaratory judgment counts, they effectively seek the same relief. Both counts simply attempt to obtain that relief through different vehicles. The sole material difference is that in Count I, Judgment Creditor asserts that the Court should pierce the corporate veil *based upon collateral estoppel (issue preclusion)*. In other words, Judgment Creditor contends that determinations made by a California court in a prior proceeding (discussed below) should be given preclusive effect and that, once given preclusive effect, those determinations establish Judgment Creditor's veil-piercing claim in this case. However, if Judgment Creditor is unable to establish that collateral estoppel is sufficient on its own to pierce the corporate veil and add Silverman to the judgments in this case, then Judgment Creditor will attempt to otherwise establish through this litigation (after discovery) that the corporate veil should be pierced as to Silverman.

[DE 170].[3]

---

[3] Silverman now attempts to characterize the Amended Complaint differently than I characterized it in the 2021 Report, and he asserts that Sam's did not plead the necessary veil-piercing elements. Not only is Silverman's argument meritless for the reasons discussed below, but Silverman did not object to any aspect of the 2021 Report (a report that was partially favorable and partially unfavorable for both sides).

Given Sam's contention that collateral estoppel (aka issue preclusion) should allow it to prevail without the need to conduct discovery or litigate other matters, I decided it would be prudent to consider the collateral estoppel issue before proceeding with discovery and other litigation in this case. Therefore, prior to the commencement of discovery and other matters, Sam's filed a summary judgment motion [DE 149] regarding whether it should prevail solely based on collateral estoppel. Its collateral estoppel argument was premised on a California judgment entered in a proceeding to which WPP and Silverman – but not Sam's – were parties. As discussed in the 2021 Report, while Silverman was not initially a judgment debtor on the California judgment, Silverman was later added to the judgment after the California court found him to be the alter ego of WPP (and another entity). In other words, the California court found alter ego *liability* to exist on the part of Silverman and thus effectively pierced the corporate veil, finding Silverman to be personally liable in that case and adding him to the judgment.[4]

However, as discussed in the 2021 Report, the California court applied California law to determine Silverman's alter ego liability in that case. In this case, though, Sam's veil-piercing claim is governed by Florida law, and the California and Florida elements for these claims are at least somewhat different. *See* 2021 Report at 4, 7-9; *see also infra* note 7. Therefore, in the 2021 Report, I examined at length whether the issues litigated and determined in the California action were identical to the issues presented by Sam's veil-piercing claim here. Ultimately, I concluded that the California court's determinations were sufficient to establish the first veil-piercing element under Florida law but not the second and third elements.[5] Thus, as reflected in the District Court's

---

[4] As explained in the 2021 Report, while "alter ego" is a component of one of the three elements needed to pierce the corporate veil, "alter ego *liability*" is synonymous with piercing the corporate veil. *See* 2021 Report at 7 n.7.

[5] The three Florida elements are set forth at the outset of the Analysis section below.

Order adopting the 2021 Report, "[c]ollateral estoppel precludes Sydney Silverman from contesting the first element necessary to pierce the corporate veil under Florida law." [DE 172] at 4. With the first element no longer being at issue, the pending cross-motions for summary judgment [DE 188, 190] attempt to establish whether or not the second and third Florida veil-piercing elements are satisfied as a matter of law.

Sam's attempts to paint a picture of Silverman using WPP's accounts as his own personal piggy bank. It provides an expert report [DE 207-1] detailing numerous transfers to Silverman, his trust, and his family members and explains, *inter alia*, that Silverman and his wife repeatedly charged personal expenses – or at least expenses with no clear business purpose – to company credit cards and that WPP paid for credit cards in Silverman's name. Specifically, the expert report indicates that between January 2015 and June 2022, WPP paid $2,415,803 in credit card payments for credit cards held by WPP and Silverman. [DE 207-1] at 5. According to Sam's expert, "the expenditures [reflected in an attachment to the expert's report] had no clear business purposes and the transactions were *predominantly personal expenses* of Silverman." *Id.* (emphasis added). The expert report also indicates that an additional $832,200 was transferred by WPP to Silverman and others related to him between January 2015 and October 2020. *Id.* The foregoing sum includes wire transfers totaling $485,000 from WPP's account to the Sydney Silverman Revocable Trust, wire transfers totaling $225,700 from WPP's account to Penni Silverman, checks totaling $130,000 from WPP to the Sydney Silverman Revocable Trust, and $5,000 in transfers to Silverman. *Id.* at 5-6. The sum of $13,500 was deducted (to then reach $832,200) on account of $13,500 Silverman transferred to WPP. *Id.* at 6.

Silverman does not dispute the calculations computed by Sam's expert. *Compare* Sam's Stmt. ¶¶ 27-32, *with* Response to Statement of Material Facts ("Silverman's Resp. Stmt.") [DE

196] ¶¶ 27-32. He also does not dispute the expert's determination that he (Silverman) and his wife charged more than $1.8 million to two WPP credit cards between June 2015 and June 2022. Sam's Stmt. ¶ 28 (undisputed). Rather, Silverman primarily contends that the funds, which he admits were paid or transferred out of WPP's account – the $2,415,803 for credit card payments and the $832,200 in transfers – were his funds, not WPP's funds. *Compare* Sam's Stmt. ¶¶ 27, 30-32, *with* Silverman's Resp. Stmt. ¶¶ 27, 30-32.

According to Silverman, he "was entitled to all profits from" WPP as the company's sole shareholder. [DE 196-1] ¶ 6. Silverman declared any funds left in WPP's account at the end of the year as part of his income and paid taxes on those funds. *Id.* ¶¶ 9-10. "To avoid any issues with a potential shortfall in the upcoming year that could trigger [Silverman] funding monies into the corporate account," all of the foregoing funds were left in WPP's account. *Id.* ¶ 11. A "scorecard" was created to reflect the remaining funds in the account, "as they accrued from year to year." *Id.* ¶ 12. Again, Silverman asserts all such remaining funds were his personal funds and not WPP's funds. *See id.* He also asserts that this "scorecard" process began in the 1990s and continued for decades. *See id.* ¶ 13. Because Silverman contends that certain funds in WPP's account were his personal funds, he contends that personal credit card charges were paid from the portion of funds in WPP's account that Silverman asserts were his. *Id.* ¶ 15. In making the foregoing assertions, Silverman relies on his own declaration [DE 196-1] and on the alleged "scorecard" evidence [DE 196-2].[6]

---

[6] Sam's seeks to exclude the "scorecard" evidence pursuant to Rule 37, contending that Silverman failed to produce it during discovery. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Silverman, however, somewhat more persuasively asserts that he did produce it during discovery. Regardless of whether it was or was not produced, the "scorecard" evidence has no bearing on the summary judgment motions for the

6

## **SUMMARY JUDGMENT STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23). *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)). Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

---

reasons discussed below.  Provided the District Court agrees with my recommendation to grant Sam's MSJ, then the discovery dispute concerning the "scorecard" evidence is moot.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted). Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

## ANALYSIS

The undisputed facts show that Sam's is entitled to judgment as a matter of law on its veil-piercing claim. In Florida,[7]

> It is black letter law . . . that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that:
>
> (1) the *shareholder* dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the *shareholders* were in fact alter egos of the corporation;

---

[7] Florida law applies to Sam's veil-piercing claim because this Court is sitting in diversity and WPP is a Florida corporation. *See ripKurrent LLC v. Richard Ballard IRA LLC*, 530 F. Supp. 3d 1281, 1298 n.3 (S.D. Fla. 2021) ("[G]enerally the law of the state of incorporation or formation applies when determining alter ego liability."); *Upfitters, L.L.C. v. Brooking*, No. 3:18-CV-496-J-34PDB, 2020 WL 954984, at *5 n.5 (M.D. Fla. Feb. 27, 2020) ("Under Florida's choice-of-law rules, the law of the state of formation applies in determining whether an entity's liability shield is pierced." (citations omitted)); *see also* 2021 Report at 7-8; [DE 172] at 4.

(2) the corporate form must have been used fraudulently or for an improper purpose; and

(3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (quoting *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)).[8] "The alter ego issue is heavily fact-specific, but alter ego liability may be decided on summary judgment." *Eckhardt v. United States*, 463 F. App'x 852, 856 (11th Cir. 2012) (citing *Miller v. Harco Nat'l Ins. Co.*, 241 F.3d 1331, 1332-33 (11th Cir. 2001)).

As indicated above, the "heavily fact-specific" first veil-piercing element has already been established in this case on collateral estoppel grounds. The parties, however, dispute whether the second and third elements – fraudulent or improper use and causation – are satisfied. Whether they are satisfied is the primary subject of the pending cross-motions for summary judgment. As discussed in Sections B and C below, the undisputed facts reveal that the second and third elements are met. First, though, Section A below addresses – and rejects – an argument in Silverman's MSJ that Sam's failed to adequately plead a veil-piercing claim.[9]

---

[8] Several cases refer to these three elements as "factors" rather than "elements." However, even cases referring to them as "factors" make clear that all three requirements need to be satisfied to pierce the corporate veil under Florida law. *See, e.g.*, *Gasparini*, 972 So. 2d at 1055 ("three factors must be proven").

[9] I note that a request to pierce the corporate veil is generally not considered to be a stand-alone claim in federal court. *See Raimbeault v. Accurate Mach. & Tool, LLC*, No. 14-CIV-20136, 2014 WL 5795187, at *9 (S.D. Fla. Oct. 2, 2014). However, the context of this case is a bit different in that liability has already been established on the underlying claims against WPP, with Sam's now seeking to pierce the corporate veil in proceedings supplementary.

## A. Silverman's Pleading Argument[10]

Silverman's pleading argument is meritless. According to Silverman, Count II does nothing more than seek a declaration that Silverman is the alter ego of WPP. Silverman contends that Count II is devoid of allegations that Silverman improperly or fraudulently used the corporate form and that any such misuse caused injury to Sam's (the second and third veil-piercing elements). Moreover, Silverman asserts that Count II has already been resolved in this action given that the Court has already found Silverman to be the alter ego of WPP (on collateral estoppel grounds). In other words, Silverman contends that Count II does not seek any other relief beyond the alter ego determination that was already given preclusive effect in the 2021 Report and the order adopting it.

Contrary to Silverman's position, Count II does plausibly plead all three veil-piercing elements and puts the reader on notice that Sam's is seeking to pierce the corporate veil. While Count II's title indicates that it contains a declaratory judgment/alter ego claim, it is clearly seeking a finding of alter ego *liability*, which as I stated in the 2021 Report (and above), is synonymous with veil-piercing. "Alter ego" may be a component of the first veil-piercing element, but Count II makes it abundantly clear that Sam's is both seeking an alter ego determination and to add "Silverman as a judgment debtor to the existing judgments," [DE 148] at 12 (i.e., to pierce the

---

[10] Silverman contends that Sam's Amended Complaint [DE 148] is subject to dismissal under Fed. R. Civ. P. 12(b)(6). When a party seeks dismissal under Rule 12(b)(6), courts must accept the factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1229 (11th Cir. 2019); *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1236 (11th Cir. 2019). "To survive a motion to dismiss, however, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

corporate veil by holding Silverman personally liable for the judgments against WPP). As noted above, I made clear in the 2021 Report that it was obvious to me that Count II is a veil-piercing claim, an observation to which Silverman did not object. For Silverman to now argue otherwise is disingenuous.

Further, Count II plainly alleges the three veil-piercing elements and supporting facts to make the claim plausible. Again, while Silverman does not contend that the first element has not been pled, he does contend that the second and third elements have not been pled. But one of the very first allegations of Count II is that "Silverman used WPP fraudulently and for an improper purpose to the extent WPP was a mere instrumentality for the transaction of Silverman's personal affairs." [DE 148] ¶ 65. Count II further alleges, *inter alia*, that Silverman commingled his personal funds with WPP funds, failed to segregate WPP funds from the funds of other Silverman entities, engaged in numerous transfers with WPP, used WPP to frustrate WPP's creditors *including Sam's*, filed this lawsuit against Sam's for an improper purpose after shutting down WPP's operations and after rendering WPP insolvent, and used WPP to pay his personal credit card expenses. *Id.* ¶ 66. These allegations, accepted as true and viewed in the light most favorable to Sam's, plausibly show that Silverman used the corporate form of WPP for an improper purpose, thereby causing injury to Sam's.

### B. Second Veil-Piercing Element – Fraudulent or Improper Use

Based on the undisputed facts, any reasonable jury would conclude that Silverman improperly used WPP's corporate form. "A critical issue in the determination of whether the corporate veil will be pierced for the imposition of personal liability is whether the corporate entity was organized or operated for an improper or fraudulent purpose." *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000) (quoting *Kanov v. Bitz*, 660 So. 2d 1165, 1166 (Fla. 3d DCA 1995)).

To demonstrate use for an improper or fraudulent purpose, Sam's would have to show that WPP was used for a purpose such as to act as "a subterfuge to mislead or defraud creditors, to hide assets, [or] to evade the requirements of a statute or some analogous betrayal of trust." *Id. See also Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998) ("Under this standard, it must be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them."); *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1116-21 (Fla. 1984); *Flooring Depot FTL, Inc., v. Wurtzebach*, 330 So. 3d 47, 49-50 (Fla. 4th DCA 2021) ("The allegations against Prizzi were that he commingled his business and personal assets and used business monies to make personal purchases. These allegations, without more, fail to meet any of the three factors . . . ." (citing *BEO Mgmt. Corp. v. Horta*, 314 So. 3d 434, 437 (Fla. 3d DCA 2020))).

Silverman's primary argument in support of Silverman's MSJ and against Sam's MSJ is that the funds he and others connected to him received from WPP's account were Silverman's personal funds. Because he only used funds he claims belonged to him to pay for personal purchases, Silverman contends that Sam's improper use and injury arguments fail. However, Silverman's personal funds contention fails both as a legal matter and because Silverman only relies on his own conclusory statements to support the contention.

As noted above, in connection with the pending cross-motions for summary judgment, Silverman only relies on his own declaration and the alleged "scorecard" evidence. But Silverman's declaration is replete with self-serving conclusory statements,[11] including several

---

[11] *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) ("'This court has consistently held that conclusory allegations without specific supporting facts have no probative value' for a party resisting summary judgment." (quoting *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000))).

legal conclusions. For instance, Silverman purports to rely on certain tax returns to support certain statements he makes, *see, e.g.*, Silverman's Stmt. ¶¶ 30-31, but Silverman has failed to provide such tax returns and to explain how they show what he asserts they show.

Moreover, Silverman fails to explain how the "scorecard" evidence shows what he asserts it shows. Specifically, Silverman wants the Court to conclude that the "scorecard" evidence reflects "what was left over in the [WPP] account that were personal Silverman funds, as they accrued from year to year, so [WPP] . . . and Silverman knew which were Silverman funds and which were earmarked as [WPP] corporate funds." Silverman's Stmt. ¶ 33. But Silverman fails to explain how the "scorecard" evidence supposedly keeps track of which funds allegedly belonged to Silverman. And a review of the "scorecard" evidence [DE 196-2], without the benefit of a specific explanation of the evidence supposedly contained therein, sheds no light. Such "scorecard" evidence consists of 29 pages. The first 12 pages appear to contain financial information from 2007 and 2008 pertaining to not just WPP but two other related entities (WP Appliances and WP Licensing) as well. The remaining pages, which are in a different format from the earlier pages (and which appear to be the product of some other type of ledger report), then reflect various transactions from 2014-2018. But Silverman does not explain in his declaration or statement of facts why it is reasonable to reach the conclusion he proposes regarding the "scorecard" evidence.[12]

---

[12] Silverman contends in his response to Sam's MSJ that the "scorecard" evidence shows that "by April 30, 2018, WPP retained $5,748,956.86 of Silverman's funds on account." [DE 197] at 6. The last page of the "scorecard" evidence does reflect a "Total Loan payable-shareholder" figure of the same amount. However, Silverman has failed to provide the necessary foundation to show why the "scorecard" evidence, which skips several years, is admissible into evidence, especially for the purpose for which he seeks to introduce the evidence. He has failed to provide the necessary background to show why the "scorecard" evidence could allow a reasonable jury to infer that Silverman only used his personal funds to pay personal expenses. Also, Silverman's Stmt. does not include facts regarding the figures in the "scorecard" evidence even though Local Rule 56.1

Regardless, even accepting Silverman's conclusory statements, Sam's is correct – as a matter of law – that the funds in WPP's account were WPP's funds, not Silverman's personal funds. Silverman essentially posits in his declaration that any funds remaining in WPP's account at the end of each year became his personal funds solely because he was WPP's sole shareholder. *See* [DE 196-1] ¶¶ 6, 8-17. In other words, he seems to contend that any retained earnings at the end of the year became his own personal funds even though they were left in the company's account and not distributed to him (or paid to him for services rendered).[13] But as Sam's points out, that is not how it works. "'Retained earnings' are '[a] corporation's accumulated income <u>after dividends have been distributed</u>.'" *Bair v. Bair*, 214 So. 3d 750, 755 (Fla. 2d DCA 2017) (emphasis in original) (citations omitted). In fact:

> 1. The retained earnings account of a corporation is a <u>bookkeeping account</u> maintained to keep a historical record of net income, net losses, dividend distributions, and other matters affecting the equity of a corporation. <u>It is not a cash or asset account, nor does it reflect any amounts of cash or funds available for distribution to stockholders.</u> In fact, a corporation could have a balance in a retained earnings account, yet have no cash to pay any dividends.
>
> 2. A balance in a retained earnings account does not mean that dividends must be paid to stockholders. In order to conduct a business, a corporation m[u]st always maintain working capital, purchase fixed assets, maintain accounts receivable, and maintain inventory among other things, all of which[ ] reduces cash available for dividends. The extent to which these requirements must be maintained fluctuates from year to year.
>
> 3. A corporation is a recognized separate legal entity capable of owning its own assets and managing its own business. <u>A stockholder has certain rights in a corporation, but those rights do not include a direct interest in any corporate asset</u>

---

requires him to indicate in his statement of facts "the material facts that [he] contends are not genuinely disputed." S.D. Fla. L.R. 56.1(a)(1). Likewise, Silverman's response to Sam's Stmt. also does not address the purported figures. It does not address them in responding to Sam's factual statements or in the Additional Material Facts section. *See* [DE 196].

[13] *See* [DE 197] at 6 ("[B]y April 30, 2018, WPP retained $5,748,956.86 of Silverman's funds on account. Some of the evidence found and produced of these handwritten score cards go back to 2007 showing 'retained' amounts in WPP['s] account.").

14

> or income nor do these rights include an interest in a corporate bookkeeping account.

*Id.* at 756 (emphasis in original) (citation omitted). "Moreover, '[a]ssets acquired through corporate earnings are corporate assets until payments are made for services or as dividends.'" *Id.* (citation omitted). Thus, Silverman's contention that the funds used to pay his personal expenses and that the funds transferred to him (and others) from WPP's account were Silverman's personal funds is incorrect as a matter of law.[14]

Because the funds in WPP's account were WPP's funds and not Silverman's funds, Silverman's actions constituted an improper use of the corporate form based on the undisputed facts. Unlike *Flooring Depot*, this is not a case that involved merely some commingling of funds, payment of some personal expenses from corporate funds, or the poor handling of business affairs.[15] Rather, even viewed in the light most favorable to Silverman, this case involved repeated, wide-spread, and long-ranging payment of Silverman's personal expenses using WPP's funds. Silverman made the deliberate choice to pay for his personal expenses using WPP's funds rather than making such funds available to pay WPP's creditors. By improperly treating WPP's funds as his own and by prioritizing his personal expenses over WPP debts, Silverman ultimately

---

[14] The fact that Silverman asserts he paid taxes on the funds at issue is a red herring. As Sam's notes, it is undisputed that WPP is an S-corporation. Therefore, corporate income would be passed through to Silverman as WPP's shareholder, and "'[p]ass through' income would be reported on [Silverman's] individual federal income tax returns. Although all of the corporate income must be reported and taxed, [Silverman does] not necessarily receive distributions of cash equal in amount to the income subject to taxation." *Zold v. Zold*, 880 So. 2d 779, 780 (Fla. 5th DCA 2004); *see also Gitlitz v. Comm'r*, 531 U.S. 206, 215 n.6 (2001) ("The very purpose of Subchapter S is to tax at the shareholder level, not the corporate level.").

[15] I have reviewed the Amended Complaint in the *Flooring Depot* case, where the appellate court found the allegations to be insufficient to pierce the corporate veil. Notably, in the Amended Complaint in that case, the only allegations regarding individual liability were that the individual defendant "is jointly and severally liable to [the plaintiffs] pursuant to Fla. Stat. § 607.0204 and/or Florida law."

caused WPP to evade liabilities, including WPP's liability to Sam's. Simply because Silverman engaged in the same conduct for more than two decades does not render his continued misconduct proper. It may not have previously caused harm to creditors when WPP was operating as a going concern, but as discussed below, Silverman's and WPP's actions did ultimately cause harm to Sam's.

Moreover, Silverman's conduct was especially improper here given that Silverman continued to regularly use WPP's funds for personal expenses even after WPP ceased operations in 2018 and after WPP was administratively dissolved in 2020. *Cf. TTT Foods Holding Co. LLC v. Namm*, No. 16-CV-81798, 2017 WL 2901329, at *10 (S.D. Fla. May 19, 2017) ("[T]here is direct evidence that Mrs. Namm used the corporate form to avoid creditors. After Mrs. Namm filed BBB's Articles of Dissolution, she continued to transfer BBB's proceeds into Deluxe's bank account instead of retaining the proceeds for BBB to pay its creditors."). Further, as Sam's correctly posits, by paying for Silverman's own personal expenses when WPP was unable to pay its creditors, Silverman and WPP violated and evaded the requirements of section 607.06401 of the Florida Statutes. As provided therein:

> (3) No distribution may be made if, after giving it effect:
> (a) The corporation would not be able to pay its debts as they become due in the usual course of the corporation's activities and affairs; or
> (b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of shareholders whose preferential rights are superior to those receiving the distribution.

§ 607.06401(3), Fla. Stat.; *see also Zold*, 880 So. 2d at 781 ("Financial responsibilities to creditors and employees must be satisfied before distributions to shareholders take place if a corporation is to remain viable.").

Here, there is no dispute that sometime prior to November 2019, WPP was unable to pay its debts as they became due in the ordinary course – at least not its debt to Sam's. Yet, as reflected in Sam's expert's report, Silverman used WPP's funds to continue to pay numerous personal expenses until at least June 2022, *see* [DE 207-1] at 46-58, 117-26, even though WPP was not operating and was unable to satisfy its debts in the ordinary course. By acting in contravention of § 607.06401(3), Silverman used WPP for an improper purpose. *Cf. TTT Foods Holding*, 2017 WL 2901329, at *8 ("Abuse of the corporate form to defraud creditors, including by making inappropriate distributions at the expense of corporate creditors, constitutes improper use of the corporate entity." (citing *Walton v. Tomax Corp.*, 632 So. 2d 178, 180-81 (Fla. 5th DCA 1994))).[16]

### C. Third Veil-Piercing Element – Causation

Silverman's improper use of WPP's corporate form caused injury to Sam's. To establish the causation element, there must be some nexus between the shareholder's fraudulent or improper operations of a company and the injury to the creditor. *Segal v. Forastero, Inc.*, 322 So. 3d 159, 165 (Fla. 3d DCA 2021) (citing *BEO Mgmt.*, 314 So. 3d at 438). "Piercing the corporate veil is not simply a mechanism to provide a plaintiff in a contract action with an after-the-fact, judicially imposed personal guaranty." *Id.*

Here, there is at least some nexus between Silverman's improper use of WPP's corporate form and the injury to Sam's. "Improper use of the corporate form causes injury to corporate

---

[16] In addition to relying on his legally flawed personal funds contention, Silverman emphasizes that he never induced Sam's into transacting with WPP by misrepresenting WPP's financial condition. Had such conduct occurred – Sam's does not argue it did – it may have provided another avenue to demonstrate fraudulent or improper use. However, the absence of such additional misconduct does not make Silverman's depletion of corporate funds for personal use any less improper. *See TTT Foods Holding*, 2017 WL 2901329, at *10 ("Plaintiff was entitled to rely on BBB's promise to repay its debt and is not required to prove that Mrs. Namm misled it regarding BBB's financial condition." (citing *USP Real Estate Inv. Trust v. Disc. Auto Parts, Inc.*, 570 So. 2d 386, 393 (Fla. 1st DCA 1990))).

17

creditors when it prevents the collection of outstanding debts." *TTT Foods Holding*, 2017 WL 2901329, at *10 (citing *Walton*, 632 So. 2d at 180; *Eckhardt*, 463 F. App'x at 858); *see also United States v. Peeler*, No. 6:13-cv-1152-ORL-40GJK, 2016 WL 7668485, at *5 (M.D. Fla. July 13, 2016). For instance, in *Eckhardt*, the Eleventh Circuit found that the sole owner of a company deprived the company of any means to pay its taxes by extensively using company funds for his personal benefit. 463 F. App'x at 858. Thus, the court concluded that the owner's improper use injured the government because it prevented the collection of outstanding taxes. *Id.*

The same is true in this case. If Silverman had not depleted WPP's funds by diverting them towards Silverman's and his family's personal expenses and benefit, WPP would have had funds available that could have been used to pay Sam's. Notably, Silverman acknowledged that when he signed the Claim Installment Payment Agreement [DE 189-6] in April 2016, he believed WPP had the ability to pay Sam's the $1.75 million due thereunder. *See* [DE 189-2] at 127. However, by improperly taking money out of WPP over and over again to the tune of more than $3 million, Silverman deprived WPP of the ability to pay Sam's.[17] Thus, Silverman's improper use caused injury to Sam's.

Ultimately, finding Silverman liable here is not the result of "an after-the-fact, judicially imposed personal guaranty." Rather, it is the result of Silverman's wrongdoing – wrongdoing that played a direct role in stripping WPP of funds that could otherwise have been used to satisfy WPP's debt to Sam's.

---

[17] Silverman argues that it was improper for Sam's expert to include in his expert analysis transfers going back to January 2015 and argues that the expert should have started his analysis in October 2017 when Sam's sent a demand to WPP. However, WPP's debts to Sam's were due much earlier than October 2017. Regardless, as discussed above and as reflected in the expert report, Silverman's depleting of WPP's account for his and his family's benefit was also prevalent in the years after 2015, including after WPP ceased operations in 2018 and after WPP was dissolved in 2020.

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court **GRANT** Sam's MSJ [DE 188] and **DENY** Silverman's MSJ [DE 190].

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 2nd day of November 2022.

Jared M. Strauss
United States Magistrate Judge